**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

IOWA FARMERS UNION,
PO Box 1883
Ames, IA 50010-1883,

DAVID BOOK, in his representative capacity as co-trustee of the Donald M. Book GST Exempt Residuary Trust,
552 Oak Valley Lane
Dixon, IL 61021,

JAMES BOOK, in his representative capacity as co-trustee of the Donald M. Book GST Exempt Residuary Trust,
1023 S Eldena Road
Dixon, IL 61021,

SVF, LLC,
1023 S Eldena Road
Dixon, IL 61021,

IOWA SOLAR ENERGY TRADE ASSOCIATION,
7745 Office Plaza Dr. N, Suite 170
West Des Moines, IA 50266,

NEW YORK SOLAR ENERGY INDUSTRIES ASSOCIATION,
P.O. Box 1523
Long Island City, NY, 11101,

RENEW WISCONSIN,
214 North Hamilton Street, Suite 300
Madison, WI 53703,

SOLAR UNITED NEIGHBORS,
1350 Connecticut Avenue NW, Suite 412
Washington, DC 20036,

*Continued on second page*

Civil Action No. __________

LTL LED, LLC d/b/a WOLF RIVER ELECTRIC,
100 Isanti Parkway Northeast
Isanti, MN 55040,

CLEAN POWER CONSULTANTS,
1000 Cordova Place
Santa Fe, NM 87505, and

DAVID A. LONEY CONSULTING,
1144 Colibri Place
Farmington, NM 87402,

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE,
1400 Independence Ave., S.W.
Washington, DC 20250,

BROOKE ROLLINS, in her official capacity as Secretary of the United States Department of Agriculture,
1400 Independence Ave., S.W.
Washington, DC 20250,

RURAL BUSINESS-COOPERATIVE SERVICE,
1400 Independence Ave. S.W., Rm 5803-S
STOP 3201
Washington, DC 20250, and

VICTORIA COLLIN, in her official capacity as Acting Administrator of the Rural Business-Cooperative Service,
1400 Independence Ave. S.W., Rm 5803-S
STOP 3201
Washington, DC 20250.

*Defendants*.

**<u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>**

## INTRODUCTION

1. This case concerns an illegitimate and unjustified effort by the United States Department of Agriculture ("USDA," or "the Department") to unlawfully frustrate Congress's clear directive to "promote energy efficiency and renewable energy development for agricultural producers and rural small businesses" through grants and loan guarantees, *see* 7 U.S.C. § 8107(a), with harmful consequences to farmers, rural small businesses, and entire communities.

2. Congress enacted Section 9006 of the Farm Security and Rural Investment Act of 2002, which evolved into the Rural Energy for America Program ("REAP"). Congress's intended purpose and goal with REAP has been to facilitate the build out of renewable energy systems, such as solar generation and wind power projects, and energy efficiency improvements in rural communities through USDA grants and loan guarantees. Congress intended that renewable energy systems constructed with REAP funds would confer environmental and public health benefits in these communities, as well as provide farmers and rural small businesses with an additional source of income. For over two decades, REAP has successfully advanced these statutory goals and funded tens of thousands of projects. Congress has repeatedly and consistently appropriated additional funding for REAP in the years since its establishment.

3. Solar energy systems are the paradigmatic projects Congress intended to fund through REAP. Solar energy projects do not produce pollution that is harmful to human health or the environment, they generate affordable electricity, and they provide a reliable stream of income to owners, operators, and lessors. REAP funding for solar projects is in high demand because many farmers and rural small businesses rely on federal support to help cover the upfront costs to install solar systems, which provide income and energy cost savings over their

useful installed lives. More than two-thirds of REAP awards went to solar projects between 2011 and the first quarter of 2025.

4. REAP-supported solar projects provide benefits both to grant and loan guarantee recipients and to a number of different businesses and communities. REAP has created jobs and expanded the market for companies that develop and install solar energy systems, including newer agrivoltaic systems, which enable farmers to produce food and renewable electricity simultaneously on the same plot of land. In addition, REAP-supported solar projects diversify rural communities' energy mix, thereby making them less reliant on imported fossil fuels whose costs are volatile. And over the course of the past two decades, a market has developed for REAP consultants, contractors, and lenders who specialize in assisting farmers and small businesses in accessing REAP's benefits.

5. Despite more than 20 years of achieving these benefits and successes, USDA announced in August 2025 that it was immediately adopting a new policy that would change REAP's loan guarantee and grantmaking rules to make almost all solar projects ineligible for REAP funding ("Anti-Solar Policy").

6. USDA immediately applied the Anti-Solar Policy to all loan guarantee applications

7. USDA indicated that it would soon be taking similar actions on solar grant applications.

8. USDA repeatedly stated that it designed the Anti-Solar Policy to "[r]apidly eliminate" and "end" taxpayer support for "wind, solar, and other 'green' energy" sources.[1]

[1] *See* Ex. A, Letter from J.R. Claeys, Adm'r, Rural Bus. Coop. Servs., to All RBCS Direct Nat'l Off. Staff (Aug. 19, 2025), https://www.rd.usda.gov/media/file/download/rbcs-ul-strong-stewardship-08222025.pdf; Ex. B, *Secretary Rollins Blocks Taxpayer Dollars for Solar Panels*

9. This stated goal, however, is directly contrary to Congress's fundamental requirement in the REAP statute that USDA "promote . . . renewable energy," including solar energy projects, through taxpayer financed grants and loan guarantees. *See* 7 U.S.C. § 8107(a).

10. USDA also justified its Anti-Solar Policy through unsubstantiated and unsupported claims that, for example, REAP subsidies to solar have "made it more difficult for farmers to access farmland by making it more expensive and less available."[2]

11. When asked to substantiate claims supporting the Anti-Solar Policy, the Administrator for Rural Business-Cooperative Service ("RBCS") stated in an internal email, "let's let the comms shop find . . . the rationale behind their statistics."[3]

12. A USDA public affairs specialist similarly wrote that she hoped that program staff could "drum up something."[4]

13. On March 31, 2026, USDA announced that it would formalize its changing policy with respect to REAP grants via a forthcoming rulemaking.

14. In the meantime, USDA ceased processing all REAP grant applications, including those that farmers and rural small businesses had already submitted to the Department before the announcement of the dramatic change in eligibility rules.

15. USDA's announcement stated that all applicants – including those that the Department had already selected for funding and encouraged to begin construction on solar projects – would need to reapply under the new rules before funding would be disbursed.

---

*on Prime Farmland*, USDA (Aug. 19, 2025), https://www.usda.gov/about-usda/news/press-releases/2025/08/19/secretary-rollins-blocks-taxpayer-dollars-solar-panels-prime-farmland.

[2] Ex. B. at 1.

[3] *See* Ex. C, FOIA Emails at 000058.

[4] *See id.* at 000056 to 000058.

16. In other words, USDA is currently applying its Anti-Solar Policy by (1) refusing to process REAP grant applications pursuant to the rules that were in place at the time such applications were received, and (2) applying the Anti-Solar Policy to REAP loan guarantee applications.

17. USDA's refusal to process grant applications under the rules that were in effect at the time of submission has had especially stark consequences on program participants because USDA administers REAP on a reimbursement basis. That is, USDA reimburses applicants for qualifying expenses *after* their REAP projects are constructed.

18. USDA invited farmers and rural small businesses to apply for REAP benefits under one set of solar-friendly rules. Heeding USDA's call, farmers and rural small businesses invested significant time and resources to prepare REAP applications for solar projects that conformed with those rules.

19. After receiving these applications, USDA communicated to many applicants that their solar projects would receive REAP funding once constructed.

20. Applicants then moved forward with building the projects, spending significant sums with the reasonable expectation of reimbursement.

21. USDA upended those reasonable expectations by retroactively changing the REAP grantmaking program to disfavor the very solar projects that the Department had only recently encouraged.

22. USDA's Anti-Solar Policy has done significant harm to Plaintiffs and other stakeholders across the country, and the toll continues to accumulate. Cash-strapped rural communities have been denied the benefits of additional cheap, reliable, and environmentally beneficial solar power during a period in which energy prices have reached historic highs.

Farmers and rural small business owners who invested time and money into the completion of grant applications under criteria announced by USDA, and who spent tens of thousands of dollars on the construction of solar projects based on assurances from USDA that they were eligible for REAP funding, now face steep monetary losses. More farmers and rural small businesses who would like to access the benefits of solar energy systems, but who cannot afford the upfront costs of installation without the support of a REAP grant or loan guarantee are also harmed by the policy. And so are many REAP consultants, solar developers, and solar installers who assisted REAP applicants in securing funding and building solar projects, and who now must operate their businesses in a smaller market.

23. USDA's Anti-Solar Policy is unlawful and arbitrary and capricious for several independent reasons. The policy thwarts Congress's intent for USDA to promote the construction of solar energy systems in rural communities. USDA's purported justifications for the Anti-Solar Policy are unrelated to the REAP statute's purposes or entirely unsubstantiated. USDA's retroactive application of the policy is prohibited. And the policy violates USDA's own regulations.

24. Plaintiffs respectfully request that this court set aside USDA's Anti-Solar Policy and order USDA to resume processing REAP grant and loan guarantee applications received before USDA announced and implemented the illegal policy.

## JURISDICTION AND VENUE

25. This action arises under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202. This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 28 U.S.C. § 1331.

26. The Court has authority to enter a declaratory judgment and to provide temporary, preliminary, and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, Fed. R. Civ. P. 57, 65; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers. The APA further authorizes the Court to grant temporary and permanent relief from agency action. 5 U.S.C. §§ 705–706.

27. Venue properly vests in this Court pursuant to 28 U.S.C. § 1391(e).

## PARTIES

28. Plaintiff **Iowa Farmers Union** ("IFU") is a Section 501(c)(5) nonprofit agricultural organization under the Internal Revenue Code with its headquarters in Ames, Iowa. IFU's mission is to strengthen independent family farms through education, legislation and cooperation and to provide Iowans with sustainable production, safe food, a clean environment, and healthy communities. IFU's membership includes both farmers and non-farmer supporters of sustainable family farming. IFU has been a strong proponent of REAP over the past 24 years. REAP's support of solar energy development over the years has significantly advanced IFU's mission to promote sustainable family farming as REAP-supported solar projects have lowered Iowa farmers' costs, increased revenues, and improved environmental sustainability of farms. Many IFU members have received REAP awards over the years. IFU members include REAP consultants and farmers who have benefited from REAP grants. As a result of USDA's actions, IFU members are no longer able to receive REAP benefits to install solar energy generation projects on their farmlands. At least two IFU farmer members lost eligibility for reimbursement for completed REAP projects when USDA announced it would retroactively apply its Anti-Solar Policy and would not process any pending REAP applications. Additionally, when USDA

declined to process all pending applications, another IFU REAP consultant member lost $470,000 in expected revenue from 55 client REAP applications. That IFU REAP consultant member consequently had to lay off their entire staff.

29. Plaintiffs **David Book and James Book, in their representative capacities as co-trustees of the Donald M. Book GST Exempt Residuary Trust** ("the Trust"), jointly bring this action on behalf of the Trust. David Book and James Book are domiciled in Dixon, Illinois. Through its co-trustees, David Book and James Book, the Trust holds legal title to more than 1,300 acres of corn and soybean farmland in Dixon, Lee County. This farmland is operated by the co-trustees together with Michael Book and Aaron Book, who are beneficiaries of the Trust. On March 31, 2023, the Trust applied for REAP funding for a solar project to offset the energy costs of a grain dryer, and on December 29, 2023, USDA informed the Trust that it had been "selected for funding" for an amount of $185,328 towards a 178 kW solar array.

30. Plaintiff **SVF, LLC** is an Illinois limited liability company ("LLC") owned and operated by Michael Book and Aaron Book, who are the sole members of the LLC and are domiciled in Dixon, Illinois. SVF, LLC owns and operates Brechon Farm, an approximately 8,000-acre corn and soybean farm located in Dixon, Illinois. Brechon Farm is located approximately one mile from the Trust's farmland. On March 31, 2023, SVF, LLC also applied for REAP funding for a solar project to offset the energy costs of Brechon Farm's own grain dryer, and on January 10, 2024, USDA informed the LLC that it had been "selected for funding" for an amount of $261,144 towards a 251 kW solar array.

31. With encouragement by USDA, the Trust and SVF, LLC (collectively, "the Book Family Farms") began construction on both solar arrays. Then, suddenly, on March 31, 2026, USDA announced that it would be retroactively applying its Anti-Solar Policy to the Book

Family Farms' applications, thereby refusing to disburse the REAP awards. USDA's action has upended the Book Family Farms' reasonable expectation of reimbursement for costs incurred in reliance on the approved REAP funding, and that has caused severe economic harm.

32. Plaintiff **Iowa Solar Energy Trade Association** ("ISETA") is a professional organization based in West Des Moines, Iowa that is dedicated to advocating for the interest of the solar energy industry and its clients in the state of Iowa. ISETA's members include both installers who service REAP projects and consultants who help REAP applicants prepare REAP applications. USDA's Anti-Solar Policy has led to installation contracts being canceled, pared back, or indefinitely paused and has reduced the size of the solar installation market. The Anti-Solar Policy has also reduced the size of and frozen the REAP application market. ISETA consultant members, who help prepare REAP applications for farmers and rural small businesses, have lost significant revenue opportunities as USDA has refused to process REAP grant applications as a result of USDA's Anti-Solar Policy.

33. **New York Solar Energy Industries Association** ("NYSEIA") is headquartered in Long Island City, in New York State and is the only statewide membership and trade association dedicated solely to advancing distributed solar and energy storage use in New York State. Founded in 1994, NYSEIA proudly represents hundreds of businesses across New York State that employ thousands of workers throughout the solar and energy storage value chain. Led by an active board of directors, NYSEIA strives to achieve significant, long-term, and sustainable growth of solar energy in New York State. Many of NYSEIA's members are solar development and installation companies working on behalf of rural small businesses and farms that directly benefit from REAP grants and loan guarantees. USDA's Anti-Solar Policy has harmed these NYSEIA members by shrinking the size of the rural solar installation market in

New York State. Furthermore, NYSEIA members were harmed by USDA's decision to retroactively apply the Anti-Solar Policy to projects that were previously eligible for REAP.

34. Plaintiff **RENEW Wisconsin** ("RENEW") is a Section 501(c)(3) nonprofit organization under the Internal Revenue Code that promotes renewable energy, including solar energy, in Wisconsin. RENEW's mission is to protect Wisconsin's natural environment and economic vibrancy by encouraging the broad-based adoption of renewable energy through advocacy, education, and collaboration. RENEW's members include solar installers who service REAP projects. USDA's Anti-Solar Policy has cost RENEW installer members significant revenue as clients have canceled, pared back, or indefinitely paused solar installation projects. USDA's Anti-Solar Policy further harms RENEW by significantly reducing the size of the solar installation market as grantees and borrowers lose access to REAP benefits.

35. Plaintiff **Solar United Neighbors** ("SUN") is a Section 501(c)(3) nonprofit organization under the Internal Revenue Code with its headquarters in Washington, DC. SUN operates in communities across the United States to build a sustainable energy system with solar at its cornerstone. Across the United States, SUN has helped 13,000 households and small businesses add 115 MW of solar, including dozens of REAP grantees. SUN's members include businesses which benefit from REAP by installing panels for projects that have received REAP grant funding and loan guarantees. REAP has been an important focus of SUN's work to promote the use of solar throughout rural America. SUN has invested significantly in preparing a REAP guide to help agricultural producers and rural small businesses understand the opportunity to apply for REAP benefits. USDA's Anti-Solar Policy interferes with SUN's core activities of facilitating and assisting with solar build out in local and rural communities because it transfers REAP benefits that have historically gone to solar projects to other types of projects. In addition,

USDA's unlawful actions have cost SUN's installer members business opportunities and have rendered SUN's investments in its REAP guide worthless.

36. Plaintiff **LTL LED, LLC d/b/a Wolf River Electric** ("Wolf River") is a solar developer and electrical contractor headquartered in Isanti, Minnesota. LTL LED, LLC's sole member is Wolf River Hold Co, a Nevada corporation with its principal place of business in Minnesota. Wolf River operates in and serves customers throughout Minnesota, North Dakota, South Dakota, Iowa, Wisconsin, Illinois, Michigan, and Colorado. Wolf River designs, develops, and installs solar and battery-storage systems for agricultural producers and rural small businesses, including projects supported or expected to be supported by REAP grants and loan guarantees. Wolf River has identified more than 300 customers and prospective customers whose proposed solar projects involved or contemplated REAP assistance. Many of those customers and projects appeared to satisfy REAP's applicant and project eligibility requirements under the rules in effect before USDA adopted the Anti-Solar Policy. USDA's Anti-Solar Policy has caused Wolf River customers to cancel, delay, or reduce planned solar projects, resulting in lost existing and prospective business and substantially reducing the market for Wolf River's services.

37. Plaintiff **Clean Power Consultants** is a renewable energy consulting firm that specializes in grant writing for REAP grants and other federally funded programs. Clean Power Consultants is owned and operated as a sole proprietorship by Sara Wolcott who is domiciled in Santa Fe, New Mexico. In line with industry standards, Clean Power Consultants derives its income by invoicing clients for services based on a small percentage of the total successful grant award. Clean Power Consultants has assisted 400+ clients in securing REAP grants since it began operating in 2013. In 2023 and 2024, Clean Power Consultants successfully secured REAP grants for its clients in 98% of cases. Much of Clean Power Consultants' business comes

from rural small businesses and agricultural producers that seek REAP grants for solar projects. USDA's Anti-Solar Policy has harmed Clean Power Consultants' business. On March 31, 2026, Clean Power Consultants had 65 applications pending with USDA. Clean Power Consultants estimates that USDA's refusal to process these applications has deprived the company of $440,000 in revenue. With the Anti-Solar Policy in effect, Clean Power Consultants is unable enter into new REAP contracts. USDA's Anti-Solar Policy also harms Clean Power Consultants by reducing the size of the REAP grant-writing market.

38. Plaintiff **David A. Loney Consulting** ("Loney Consulting") is a sole proprietorship owned and operated by David A. Loney who is domiciled in Farmington, New Mexico. David A. Loney Consulting provides federal grant consulting services to rural businesses and farmers in multiple states. A significant portion of Loney Consulting's business involves the REAP grant program. From 2023 to 2025 Loney Consulting made hundreds of thousands of dollars in consulting revenue. In 2026, because of the Anti-Solar Policy, Loney Consulting experienced a dramatic reduction in REAP work and revenue.

39. Defendant **U.S. Department of Agriculture** is an agency within the meaning of the APA, 5 U.S.C. § 701. USDA operates under the supervision and direction of the Secretary of USDA.

40. Defendant **Brooke Rollins** is the Secretary of USDA and is sued in her official capacity only.

41. Defendant **Rural Business-Cooperative Service** is a subagency of USDA and an agency within the meaning of the APA, 5 U.S.C. § 701. RBCS operates under the supervision and direction of its Administrator.

42. Defendant **Victoria Collin** is the Acting Administrator of RBCS and is sued in her official capacity only. [5]

## STATUTORY AND REGULATORY FRAMEWORK

### I. Congress Enacted the Rural Energy for America Program to Support Renewable Energy Development Projects for the Benefit of the Environment, Public Health, Farmers, and Rural Communities

*a. The Legislative History of REAP Demonstrates that Congress Viewed the Funding of Renewable Energy Systems and the Transition Away from Fossil Fuels as Beneficial to Both Farmers and the Environment*

43. In 2002, Congress passed the new "Energy" Title IX into the Farm Security and Rural Investment Act of 2002 ("2002 Farm Bill"). *See* Farm and Security and Rural Investment Act of 2002, Pub. L. No. 107-171, §§ 9001–9010, 116 Stat. 134, 475–486 (2002). The new Energy Title IX established several new programs that made significant sums of federal funds available for investments in renewable energy and energy efficiency.

44. The Senate version of the 2002 Farm Bill, sponsored by Senator Tom Harkin (D-IA) and Senator Dick Lugar (R-IN), set forth the purposes of the Energy Title, explaining that investments in renewable energy and energy efficiency "provide environmental and public health benefits such as cleaner air and water" and "improve electricity grid reliability." *See* 148 Cong. Rec. S1108 (daily ed. Feb. 25, 2002). The Senate also found that "farm-based renewable energy generation can become one of the major cash crops of the United States, improving the livelihoods of hundreds of thousands of family farmers, ranchers, and others and revitalizing rural communities." *See id.*

[5] References herein to "USDA" include the U.S. Department of Agriculture, RBCS, Secretary Rollins, and other Department officials acting in their official capacities.

45. Senator Tom Harkin, who served as the Chairman of the Senate Agriculture Committee and co-sponsored the 2002 Farm Bill, added that the legislation would "help reduce the use of oil and gas by promoting alternative energy sources on farms and in rural communities." *See* 148 Cong. Rec. S3909 (2002).

46. To these ends, the 2002 Farm Bill's Energy Title IX included two new federal funding programs which aimed "to assist farmers, ranchers, and rural small businesses in becoming more energy efficient and in using renewable energy technology and resources"—the Energy Audit and Renewable Energy Development Program and the Renewable Energy Systems and Energy Efficiency Improvements program. *See* Pub. L. No. 107-171, §§ 9005–9006, 116 Stat. 134, 480–482.

47. The 2002 Farm Bill passed with bipartisan support in the Senate and House and by a roughly 2-1 voting margin in each chamber.[6]

48. In the 2008 Farm Bill, Congress consolidated these two successful energy programs into the Rural Energy for America Program, codified at 7 U.S.C. § 8107 in the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, § 9007, 122 Stat. 1651, 2077–2079 (2008).

*b. Congress Required USDA to Take Proactive Measures to Fund Solar Projects Through REAP*

49. The REAP statute mandates that the Secretary of USDA ("the Secretary") "shall establish" a program "to promote energy efficiency and renewable energy development for agricultural producers and rural small businesses." 7 U.S.C. § 8107(a).

[6] *See* David Stout, *Senate, by 64-35 Vote, Passes Farm Bill Costing $180 Billion*, N.Y. Times (May 8, 2002), https://www.nytimes.com/2002/05/08/politics/senate-by-6435-vote-passes-farm-bill-costing-180-billion.html.

50. To fulfill REAP's purposes, Congress required that USDA "shall provide" grants and loan guarantees to farmers and rural small businesses to finance energy efficiency improvements and "to purchase renewable energy systems, including systems that may be used to produce and sell electricity." *Id.* § 8107(c)(1)(A).

51. The statute defines "renewable energy system" to mean any "system that produces usable energy from a renewable energy source." *Id.* § 8101(16).

52. Congress expressly defined "renewable energy" to include solar energy. *See id.* § 8101(15)(A).

53. To implement REAP, Congress provided USDA with "mandatory funding" that the Department "shall use" in carrying out the program. *Id.* § 8107(f)(1). Specifically, Congress provided that $50,000,000 is "to remain available until expended" for "fiscal year 2014 and each fiscal year thereafter." *Id.* Over the years, Congress has at times also authorized additional discretionary funds that USDA may, but is not required to, use for REAP. *See*, *e.g.*, Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, § 9007, 122 Stat. 1651, 2079; 7 U.S.C. § 8107(f)(3).

54. Congress directed USDA to conduct outreach regarding REAP at the State and local levels to fulfill the program's purposes "to the maximum extent practicable." 7 U.S.C. § 8107(d).

### *c. Congress Limited USDA's Discretion to Deny REAP Funds to Eligible Solar Projects*

55. While Congress created several complex eligibility limitations to receive REAP awards for *energy efficiency* projects *see id.* § 8107(c)(1)(A)(ii)–(B), lawmakers created only two simple eligibility criteria for *renewable energy* projects,[7] including solar projects:

- Awards must be used to assist with the purchase of "renewable energy systems, including systems that may be used to produce and sell electricity." *Id.* § 8107(c)(1)(A)(i).
- The purchaser must be an agricultural producer or a rural small business. *Id*.

56. The REAP statute also provides that USDA "*shall* take into consideration" six factors when "determining the amount of a loan guarantee or grant provided" to an eligible project under REAP, and each relates to the degree to which the proposed project will produce renewable energy, energy efficiency, or environmental benefit. *Id.* § 8107(c)(2) (emphasis added). These factors include:

- "the type of renewable energy system to be purchased";
- "the estimated quantity of energy to be generated by the renewable energy system";
- "the expected environmental benefits of the renewable energy system";
- "the quantity of energy savings expected to be derived from the activity, as demonstrated by an energy audit";

[7] Energy efficiency projects help farmers and rural small businesses consume less energy (e.g., efficient lighting, HVAC improvements, door and windows improvements, energy-efficient equipment). Renewable energy projects generate energy with onsite, renewable resources (e.g., solar, hydropower, and wind).

- “the estimated period of time for the energy savings generated by the activity to equal the cost of the activity”; and
- “the expected energy efficiency of the renewable energy system”.

*Id.* § 8107(c)(2)(A)–(F).

57. Any other factors USDA considers when evaluating REAP grant and/or loan guarantee applications must be “appropriate.” *Id.* § 8107(c)(2)(G).

*d. Congress Continues to Support REAP*

58. Congress has lightly amended REAP in subsequent bills. *See* American Taxpayer Relief Act of 2012, Pub. L. No. 112-240, § 701(f)(6), 126 Stat. 2362, 2365 (2013); Agricultural Act of 2014, Pub. L. No. 113-79, § 9007, 128 Stat. 649, 930–931 (2014); and 2018, Agriculture Improvement Act of 2018, Pub. L. No. 115-334, § 9007, 132 Stat. 4490, 4886 (2018).

59. Most recently, Congress obligated significant supplemental funding for REAP for 2022 through September 30, 2031. *See* Inflation Reduction Act of 2022, Pub. L. No. 117-169, § 22002(a), 136 Stat. 1818, 2019 (2022).

60. Specifically, Congress appropriated an additional $820,250,000 for REAP for fiscal year 2022, and another $180,276,500 for each of fiscal years 2023 through 2027, with any unspent funds to remain available until September 30, 2031. *Id.*

61. Congress also increased the amount that REAP grant-recipients could receive from the original 25% of the cost of a project to up to 50% of the cost of a project. *Compare* 7 U.S.C. § 8107(c)(3)(A) *with* Pub. L. No. 117-169, § 22002(a).

62. Congress has not repealed or modified REAP’s statutory mandate to fund renewable energy systems, which include solar projects.

## II. In Compliance with Congress's Mandates, USDA has Promulgated Regulatory Standards Governing Its Awards of REAP Grants and Loan Guarantees

63. USDA regulations set forth the Department's standard process for awarding REAP loan guarantees, *see* 7 C.F.R. pt. 5001 (2025), and REAP grants, *see* 7 C.F.R. pt. 4280 (2025).

64. In 2005, USDA promulgated the first iteration of the regulations to implement the statutory Renewable Energy Systems and Energy Efficiency Improvements program.

65. In 2011, USDA updated the regulations in response to Congress's directive to consolidate REAP. *See* Renewable Energy Systems and Energy Efficiency Improvements Grant, Guaranteed Loan, and Direct Loan Program, 70 Fed. Reg. 41264 (July 18, 2005); Rural Energy for America Program, 76 Fed. Reg. 21110 (Apr. 14, 2011).

66. The regulations require USDA to determine whether a project is eligible for a REAP award, *see* 7 C.F.R. §§ 4280.116(c)(3), 5001.315(b), and include a list of eligibility criteria that are specific to renewable energy systems, which ensure that any funded solar project:

- Uses commercially available technology,
- Supports a rural small business or an agricultural producer, and
- Has technical merit.

*See id.* §§ 4280.113(b)–(d), 5001.106.

67. The regulations make residences, certain types of loans, illicit projects (e.g., projects violating the Constitution's establishment clause), and other projects that are not renewable energy systems expressly ineligible for REAP loan guarantees. *See id.* §§ 5001.102(a)–(c), 5001.115, 5001.119.

68. The regulations also make certain projects that are illicit, do not advance REAP's environmental and public health purposes, or are not renewable energy systems expressly ineligible for REAP grants. *Id.* § 4280.114.

69. If a project is eligible for a loan guarantee or grant, then the regulations require USDA to assign the project's application a score of up to 90 points for loan guarantees or up to 100 points for grants. *Id.* §§ 5001.315(b)–(c), 5001.319, 4280.121. When total loan guarantee or grant requests exceed the amount of REAP funding available, higher scoring applications receive first consideration for awards. *Id*. §§ 5001.315(c)–(d), 4280.122(c)–(d).

70. The regulations award points based on a list of scoring criteria that relate to the following:

- The environmental benefits of the project;
- The energy generated, replaced, or saved by the project;
- The reliability of the applicant and the financial viability of the project; and
- In the case of grants, the monetary value of the grant requested.

*See id.* §§ 5001.319(a)–(f), 4280.121(a)–(g).

71. The regulations also allow USDA to award up to 10 points to an application on a discretionary basis to ensure that loan guarantees or grants are disbursed:

- To underrepresented regions or technologies
- To applicants with higher needs (e.g., those located in a federally declared disaster area); or
- To advance another policy priority of the executive branch.

*See id.* §§ 5001.319(g), 4280.121(h).

72. The regulations state that "[u]nder no circumstances," *id.* § 50001.319(g), and "[i]n no case," *id.* § 4280.121(h), will an application receive more than 10 points on the basis of policy priorities of the President or Secretary.

73. USDA's regulations state that the Department may only update its grant application scoring criteria through a Federal Register notice. *See id.* § 4280.121.

## FACTUAL BACKGROUND

### I. For Decades, Farmers and Rural Small Businesses Have Relied on REAP to Build Solar Energy Projects that Generate Electricity and Provide Environmental and Economic Benefits

#### *a. Under the Standard REAP Application Process, Solar Projects Have Always Been Eligible for Grant and Loan Guarantee Awards*

74. The REAP application process begins with USDA publishing a Notice of Funding Opportunity ("NOFO") in the Federal Register that informs potential grant and loan guarantee applicants of the availability of REAP funding and the processes and rules by which their REAP applications will be evaluated.

75. For example, the NOFO may establish application deadlines, or modify the grant application evaluation criteria published at 7 C.F.R. § 4280.121.

76. USDA last issued a NOFO seeking REAP proposals in 2024. Notice of Funding Opportunity for the Rural Energy for America Program for Fiscal Years 2025, 2026, and 2027, 89 Fed. Reg. 83449 (Oct. 16, 2024) ("2024-27 NOFO"). This NOFO set forth the evaluation criteria that would govern USDA's award of REAP funding for fiscal years 2025, 2026, and 2027. *See id*. at 83449.

77. The NOFO applied prospectively, specifying that "[a]pplications received the date following the publication of this notice through September 30, 2027, will be evaluated and

scored according to the provisions listed in this notice, unless otherwise amended via a subsequent notice." *Id.* ("Summary").

78. The NOFO also specified that it would "not be applied retroactively to any applications previously filed." *Id.*

79. The 2024-27 NOFO "encourage[d]" REAP applicants to apply for REAP grants and loan guarantees to generate renewable energy and "reduce climate pollution," including through solar energy projects. *See id.* at 83449, 83453; *see also* 7 C.F.R. § 4280.121(a)–(b).

*b. REAP Grants Are Disbursed as Reimbursements*

80. In contrast to loan guarantees, which only result in a disbursement of federal funds in the event of default on a loan, REAP grants operate on a reimbursement model. A renewable energy system must be fully constructed before USDA fully disburses the award to the awardee. *See* 7 C.F.R. §§ 4280.119(d)(2), 4280.120(d)(2), 4280.124(g)(5). In other words, grant applicants incur costs of their projects upfront and only seek reimbursement for eligible expenses once the projects are complete.

81. Once USDA informs a solar energy project grant recipient that a project has been selected for funding, the Department provides grant recipients with a number of forms, informs the grantee that construction on the project may commence, and explains the requirements to obtain final reimbursement for applicable project costs.

82. To ensure that the costs incurred to build a project are eligible for reimbursement, grant recipients typically correspond with USDA officials throughout the solar project construction process. This correspondence helps to ensure that grant recipients comply with the conditions of the grant and the requirements of REAP.

83. USDA will not reimburse any costs that a grant applicant incurs before their REAP application is submitted. *Id.* § 4280.115(c).

*c. Farmers and Rural Communities Have Benefited from REAP-Funded Solar Projects*

84. Since 2014, USDA has awarded REAP grants and loan guarantees to more than 19,000 agricultural producers and rural small businesses across all fifty states.

85. The USDA's report published in May 2025, recognized that REAP-funded "[r]enewable energy projects benefit agricultural producers and rural small businesses with new and sustainable income streams; reduced reliance on fossil fuels; and an improved environment"; and, in the same report, USDA also acknowledged that in 2024 alone REAP projects had generated or saved enough energy to power more than 300,000 homes.[8]

86. The May 2025 USDA report includes five "Selected Examples of Recent Progress" in administering REAP.[9] Four of the five examples detail the benefits of solar energy projects recently installed with REAP funding.[10] For example, the report states that:

> $1 million [in] investment went to Fieldale Farms Poultry LLC, a poultry farm in Baldwin, Habersham County. These funds will be used to purchase and install a 1.5 MW solar array on six vacant acres of the property. This project will realize $176,490 per year of income and will generate 2,206 MWh per year, enough to power 204 homes.[11]

87. In recent years, solar has been the most popular renewable energy technology in REAP. According to USDA's REAP award data, 68 percent of REAP grant and loan guarantee awards were provided to solar projects between 2011 and the first quarter of 2025.

---

[8] USDA, *2026 USDA Explanatory Notes - Rural Business-Cooperative Service*, at 32-4, 32-67 (2025), https://www.usda.gov/sites/default/files/documents/32-2026-CJ-RBCS.pdf.
[9] *Id*. at 32-67 to -68.
[10] *Id*.
[11] *Id*. at 32-67.

88. Solar's popularity and success within REAP are attributable to the significant financial, environmental, and productivity benefits of rural solar energy development projects. Indeed, USDA and other government agencies and departments, including the U.S. Department of Energy ("DOE"), have long recognized the wide array of benefits offered by rural solar energy generation.[12]

89. A DOE study shows that pairing solar energy panels with agricultural uses simultaneously improves certain forms of agricultural production *and* the efficiency of the solar panels.[13] Indeed, solar energy generation projects can increase a farm's economic value by 30% and annual income by 8%.[14]

90. The emerging field of agrivoltaics is especially promising in this regard.[15] Solar panels can help keep farmworkers, crops, and grazing animals cooler by shielding them from the

---

[12] *See* DOE, *Solar Futures Study* 17, 181–82 (2021), https://www.energy.gov/sites/default/files/2021-09/Solar%20Futures%20Study.pdf; USDA, RBCS, *Cooperative and Community Opportunities in Solar Energy* (2021), https://www.rd.usda.gov/sites/default/files/CooperativeAndCommmunityOpportuniesInSolarEnergy.pdf; Erin McDuff, *Shining a Light on Solar Energy Benefits for Rural Farm, Community*, USDA (July 17, 2018), https://www.rd.usda.gov/newsroom/success-stories/shining-light-solar-energy-benefits-rural-farm-community; *Large-Scale Solar Siting Resources*, DOE, https://www.energy.gov/cmei/systems/large-scale-solar-siting-resources (last visited Sep. 18, 2026).

[13] *See*, *e.g.*, *Large-Scale Solar Siting Resources*, DOE, https://www.energy.gov/cmei/systems/large-scale-solar-siting-resources (last visited Sep. 18, 2026) (citing research that found a 3-fold increase in crop yields, a significant reduction in irrigation requirements, and an increase in solar panel performance after solar panels were installed in certain conditions); *see* Harshavardhan Dinesh & Joshua M. Pearce, *The Potential of Agrivoltaic Systems*, 54 Renewable & Sustainable Energy Revs. 299 (2016); Svoboda Vladimirova Pennisi, *Empowering Biodiversity on Solar Farms*, Univ. of Ga. (2020), https://www.caes.uga.edu/research/impact/impact-statement/9839/empowering-biodiversity-on-solar-farms.html.

[14] Harshavardhan Dinesh & Joshua M. Pearce, *The Potential of Agrivoltaic Systems*, 54 Renewable & Sustainable Energy Revs. 299 (2016); Henry J. Williams et al., *The Potential for Agrivoltaics to Enhance Solar Farm Cooling*, 332 Applied Energy (2023).

[15] *Farmer's Guide to Going Solar*, DOE, https://www.energy.gov/cmei/systems/farmers-guide-going-solar (last visited Sep. 18, 2026); *Using the Sun to Produce Green Plants and Green*

sun,[16] increasing yields and decreasing water needs. Solar panels can also be paired with pollinator habitats, which can increase yields on adjacent agricultural lands due to thriving pollinator communities.[17]

91. Solar energy generation projects provide many direct economic benefits to farmers. When farmers lease their land for solar projects or directly sell solar energy, they diversify their income stream and thereby shield themselves from fluctuations in the price of the crops they sell and the farm inputs they must buy, like fertilizer. A Purdue University study tracking an Indiana corn-soybean rotation farm found that net farm income averaged just $125 per acre since 2007.[18] Solar energy project leases, by contrast, commonly run more than $1,000 per acre, fixed for a term of years and escalating.[19]

92. Moreover, the benefits of solar energy projects on farms can extend more generally to surrounding rural communities. A DOE report acknowledges as much, describing

---

*Energy*, USDA, https://www.ars.usda.gov/oc/dof/using-the-sun-to-produce-green-plants-and-green-energy/ (last updated July 18, 2024); Am. Solar Grazing Ass'n, *Solar Grazing: A New Vision for Farming & Energy in America* (2025), https://solargrazing.org/wp-content/uploads/2025/05/ASGA-SolarGrazing-Pamphlet-Public-1.pdf.

[16] *See Agrivoltaics: Pairing Solar Power and Agriculture in the Northwest*, USDA, https://www.climatehubs.usda.gov/hubs/northwest/topic/agrivoltaics-pairing-solar-power-and-agriculture-northwest (last visited Sep. 18, 2026).

[17] DOE, *Solar Futures Study*, *supra* note 12 at 181; Michele Boyd, *Buzzing Around Solar: Pollinator Habitat Under Solar Arrays*, DOE (June 21, 2022), https://www.energy.gov/cmei/systems/articles/buzzing-around-solar-pollinator-habitat-under-solar-arrays.

[18] Michael Langemeier, *Projected Net Income per Acre for West Central Indiana Case Farm*, Purdue Univ. Ctr. for Com. Agric. (Sep. 10, 2025), https://ag.purdue.edu/commercialag/home/resource/2025/09/projected-net-income-per-acre-for-west-central-indiana-case-farm/ (showing that in recent years income spiked to $331 and $338 per acre in 2021 and 2022, turned negative in 2024, and remained negative in 2025 and 2026 projections).

[19] James Mintert & Michael Langemeirer, *Solar Payment Rates to Farmers Top $1K per Acre in Nearly 70% of Offers, Says Purdue Survey*, Mich. Farm News (July 8, 2024), https://www.michiganfarmnews.com/solar-payment-rates-to-farmers-top-1k-per-acre-in-nearly-70-of-offers.

how solar projects provide surrounding rural communities with "jobs, . . . access to clean electricity, and improv[ed] food security."[20] Solar energy generation can also help neighboring property owners by stabilizing energy prices, reducing energy transmission costs, and increasing local tax revenues.[21]

93. Taxpayers benefit when farmers have more stable, diverse income streams. Farm income is often propped up by federal subsidies.[22] The Environmental Working Group's Farm Subsidy Database shows farmers collected $113.9 billion between 2020 and 2024 alone.[23] By contrast, solar income requires no comparable annual taxpayer intervention to stay positive.

## II. Defendants Adopt an Extraordinary Anti-Solar REAP Policy

### *a. The Trump Administration Issues an Anti-Solar Executive Order*

94. On July 7, 2025, the Trump Administration issued Executive Order 14315, Ending Market Distorting Subsidies for Unreliable, Foreign-Controlled Energy Sources, 90 Fed. Reg. 30821 (July 7, 2025) ("Anti-Solar EO").

95. The Anti-Solar EO announces the Trump Administration's policy to "end" taxpayer subsidies for renewable energy, including solar energy, with the stated purposes relating

---

[20] *Farmer's Guide*, *supra* note 15.

[21] *See* McDuff, *supra* note 12; *Solar Powers County Improvements Without New Taxes*, Ctr. for Infrastructure & Econ. Dev., https://centerforlocalpolicy.org/solar-project-means-growth-in-accomack-county-va-fund-without-new-taxes/ (last visited Sep. 18, 2026); *Community Solar*, Nat'l Lab'y of the Rockies, https://www.nlr.gov/state-local-tribal/community-solar (last updated May 20, 2026); *The Benefits of Shared Solar to Virginia's Grid*, Dunsky Energy + Climate (Nov. 29, 2023), https://dunsky.com/project/the-benefits-of-shared-solar-to-virginias-grid/.

[22] U.S. Gov't Accountability Off., *Crop Insurance: Update on Opportunities to Reduce Program Costs*, GAO-24-106086 (2023), https://www.gao.gov/products/gao-24-106086; *Reduce Subsidies in the Crop Insurance Program*, Cong. Budget Off. (Dec. 12, 2024), https://www.cbo.gov/budget-options/60893 (finding the federal government pays approximately 60 percent of premiums on average).

[23] Anne Schechinger, *Triple Dipping: Budget Bill Raises Farm Subsidies for Wealthy Farmers by Billions of Dollars*, Env't Working Grp. (June 10, 2025), https://www.ewg.org/research/triple-dipping-budget-bill-raises-farm-subsidies-wealthy-farmers-billions-dollars.

generally to aesthetics, national security, trade, and fiscal policy. *See* Anti-Solar EO at 30821 (§§ 1–2).

96. The Anti-Solar EO expresses the Administration's goal to replace renewable energy with so-called "dispatchable" energy sources, including "fossil fuels." *See id.* (§ 1).[24]

97. The Anti-Solar EO directs the Department of the Treasury to terminate certain tax credits for solar facilities under sections of the Internal Revenue Code, directs the Department of the Interior to eliminate preferential treatment for solar facilities, and imposes reporting obligations on the Departments of the Treasury and Interior. *See id.* at 30821–22 (§§ 3–5).

98. The Anti-Solar EO also states that it must "be implemented consistent with applicable law and subject to the availability of appropriations." *See id.* at 30822 (§ 6(b)).

99. The Anti-Solar EO does not mention USDA, or REAP, or specifically direct USDA to do anything.

*b. USDA Directs Staff to Immediately Restrict REAP Funding for Solar Renewable Energy Systems*

100. On August 19, 2025, the Administrator for RBCS, the office within USDA that administers REAP, issued instructions to staff through an "Unnumbered Letter" entitled "Ensuring Strong Stewardship and Customer Service in RBCS Guaranteed Lending & Other Programs." *See* Ex. A, Unnumbered Letter.

101. The Unnumbered Letter falsely states: "Per the order of [the Anti-Solar EO] we have been directed to" carry out several anti-renewable energy policy goals. *See id.* at 2.

---

[24] *See Fact Sheet: President Donald J. Trump Ends Market Distorting Subsidies for Unreliable, Foreign-Controlled Energy Sources*, The White House (July 7, 2025), https://www.whitehouse.gov/fact-sheets/2025/07/fact-sheet-president-donald-j-trump-ends-market-distorting-subsidies-for-unreliable-foreign-controlled-energy-sources/.

102. Specifically, the Unnumbered Letter states that the Anti-Solar EO directs RBCS to "[r]apidly eliminate… costs imposed on taxpayers by" renewable energy subsidies, "[b]uild upon and strengthen the repeal of and modifications to . . . solar . . . energy tax credits," and "[e]nd taxpayer support for" renewable energy sources and supply chains with links to certain foreign governments. *See id.*

103. The Unnumbered Letter, addressed to all RBCS National Office and Field Office Staff, is designed to "provide notice to Rural Business Cooperative Service staff of the Administrator's direction," and explains that, "[g]iven [the Anti-Solar EO's] directions, we are moving forward with . . . policy action[] effective immediately" to restrict REAP funding for solar energy projects. *See id.* at 1–2.

104. The Unnumbered Letter creates four new criteria governing the REAP application review process, and states that REAP projects meeting any of the four criteria are "ineligible" for loan guarantees and "disincentivized" for grants. *See id.* at 2.

105. The four criteria are:

> "• ground mount solar photovoltaic systems larger than 50 kW;[25]
>
> • ground mount solar photovoltaic systems that cannot document historical energy usage;
>
> • ground mount solar photovoltaic systems proposing to be installed on certified cropland as defined by the Farm Service Agency in Handbook 10-CM (rev. 2)[26] exhibit; or

---

[25] For perspective, this is less than one third the size of the solar array Book Farms needs to offset the energy costs of its grain dryer. One UK-based solar installer states that the "typical" solar array installed to power a grain storage and drying operation is between 50 to 250 kW. *See Solar Panels for Grain Stores*, Com. Solar Panels Installation, https://commercialsolarpanelsinstallation.co.uk/solar-panels-for-grain-stores/ (last visited Sep. 21, 2026).

[26] USDA's Farm Service Agency Handbook 10-CM does not, in fact, define "certified cropland." *See* Farm Serv. Agency, *Farm Records and Reconstitutions: For State and County Offices*, https://www.fsa.usda.gov/Internet/FSA_File/10-cm_r02_a06.pdf (absence).

- solar photovoltaic systems consisting of any component made in a country named as a foreign adversary as defined in 15 CFR 791.4."

*See id.* at 2–3.

106. Once implemented, the four criteria in the Unnumbered Letter would effectively prohibit the disbursement of REAP grants or loan guarantees for the vast majority of solar energy projects.

107. For example, the third criterion prohibits farmers from installing solar on 377 million acres of U.S. cropland.[27] This represents about one-third of all agricultural land[28] in the United States.[29]

108. The fourth criterion, which restricts REAP funding for projects "consisting of [] component[s]" manufactured in some markets abroad is even more prohibitive. In the present solar facility market, it would be an almost impossible task for a farmer or rural small business to find solar panels without such components. For example, about 97% of silicon wafers—key components of solar cells—are manufactured in markets targeted by the criterion, and any solar system incorporating such wafers would no longer be eligible for REAP funding.[30]

---

[27] *See* Clayton P. Winters-Michaud, *ERS Data Series Tracks Major Uses of U.S. Land with a Focus on Agriculture*, USDA (Dec. 30, 2024), https://www.ers.usda.gov/amber-waves/2024/december/ers-data-series-tracks-major-uses-of-u-s-land-with-a-focus-on-agriculture.

[28] *Id*.

[29] Not all cropland is of equal value for growing crops. USDA acknowledges that some is only "marginally productive in most crop production years." Scott Elliott, *Cashing in on Marginal Lands*, USDA, https://scientificdiscoveries.ars.usda.gov/tellus/stories/articles/cashing-marginal-lands (last visited Sep. 21, 2026).

[30] Ex. D, USDA, *Ensuring Strong Stewardship and Customer Service in RBCS Guaranteed Lending and Other Programs: Frequently Asked Questions* (2025), at 000022 ("Strong Stewardship FAQs") (confirming that projects containing components "made in . . . China" are disincentivized for grants and ineligible for loan guarantees); DOE, *Solar Photovoltaics: Supply Chain Deep Dive Assessment*, at iii (2022), https://www.energy.gov/sites/default/files/2022-02/Solar%20Energy%20Supply%20Chain%20Report%20-%20Final.pdf.

109. Moreover, the Unnumbered Letter does not provide clear guidance on what it means for a solar project to "consist of" a component. Thus, even if a REAP applicant attempted to source all components of a project from qualifying markets is likely to be stumped and stymied by the lack of clear guidance.

*c. Secretary Rollins Announces Restrictions on Solar Renewable Energy Systems Under REAP*

110. In tandem with RBCS Administrator Claeys' distribution of the Unnumbered Letter to RBCS staff, Secretary of Agriculture Rollins held a press conference, announcing USDA's new anti-solar REAP policy.[31]

111. Secretary Rollins set forth two goals for the Anti-Solar Policy. *First*, Secretary Rollins stated that "[w]e are no longer allowing businesses to use your taxpayer dollars to fund solar projects on prime American farmland." *Second*, Secretary Rollins stated that "we will no longer allow solar panels manufactured by foreign adversaries to be used in our USDA-funded projects."[32]

112. Secretary Rollins justified the policy in part on aesthetics, claiming that "beautiful farmland" is being "displaced" by solar projects, and also asserted that "[s]ubsidized solar farms" have made farmland "more expensive and less available."[33]

113. Secretary Rollins provided no evidence to support these assertions.

114. To the contrary, USDA has published data showing that wind turbines and solar farms combined used *less than 0.05 percent* of the nearly 900 million acres used for farmland in 2020.[34]

---

[31] *See* Ex. B, Press Release.
[32] *See id*.
[33] *See id*.
[34] *See* Ryan Hanrahan, *USDA Ending Loan Support for Solar Projects on Farmland*, Farm Pol'y News, Univ. Ill. Urbana-Champaign (Aug. 19, 2025),

115. As a point of comparison, the corn ethanol industry—which is also subsidized by taxpayers with USDA's support[35]—currently uses more than 65 times that amount of land, while solar energy produces about 30 times the energy per acre as corn ethanol.[36]

116. Moreover, DOE estimates that solar energy development will require *only 0.3 percent* of U.S. farmland by 2035 to help meet the nation's growing need for renewable energy.[37]

117. In many instances, the small amount of farmland used by solar energy projects is not actually displaced. For example, with agrivoltaics, agricultural land can support both solar power generation and farming in the same location.[38]

118. Since solar panels generate approximately 13 times more revenue per acre than crops,[39] producing solar power alongside productive agricultural land can diversify farmers' revenues, providing them with a degree of financial stability, and helping them prevent the conversion of agricultural land to other uses.[40]

---

https://farmpolicynews.illinois.edu/2025/08/usda-ending-loan-support-for-solar-projects-on-farmland/.

[35] *See*, *e.g.*, *USDA Invests in Additional Domestic Biofuels and Clean Energy Projects to Lower Costs and Increase American Energy Security Across the Nation*, USDA (Jan. 10, 2025), https://www.usda.gov/about-usda/news/press-releases/2025/01/10/usda-invests-additional-domestic-biofuels-and-clean-energy-projects-lower-costs-and-increase; *Secretary Rollins Announces Availability of $7 Million for Advanced Biofuel Production*, USDA (Nov. 21, 2025), https://www.rd.usda.gov/newsroom/news-release/secretary-rollins-announces-availability-7-million-advanced-biofuel-production; Samantha Ayoub & Faith Parum, *Ag-Powered Fuels: 45Z Clean Fuel Production Credit*, Farm Bureau (July 24, 2025), https://www.fb.org/intel/markets/45z-clean-fuel-production-credit.

[36] Matthew A. Sturchio, Adam Gallaher & Steven M. Grodsky, *Ecologically Informed Solar Enables a Sustainable Energy Transition in US Croplands*, 122 PNAS (2025).

[37] *See Farmer's Guide*, *supra* note 15.

[38] *See*, *e.g.*, *Agrivoltaics*, *supra* note 16.

[39] *See* Aaron Smith, *Should Farmers Plant Solar Panels or Corn?*, Ag Data News (Feb. 3, 2025), https://agdatanews.substack.com/p/should-farmers-plant-solar-panels-18c?utm_campaign=post-expanded-share&utm_medium=web.

[40] *See*, *e.g.*, McDuff, *supra* note 12; *Farmer's Guide*, *supra* note 15.

119. Moreover, any land converted to solar energy use can eventually be converted back to agricultural use.[41]

120. Together, Secretary Rollins's announcement and the Unnumbered Letter reflect USDA's policy-level decision not to award REAP grants or loan guarantees for almost all solar energy projects.

*d. USDA Publishes Press Release Announcing the Anti-Solar Policy*

121. USDA also published a press release on August 19, 2025, announcing the Anti-Solar Policy to a wider audience. *See* Ex. B, Press Release.

122. Echoing Secretary Rollins' inaccurate statements in her earlier press conference, the press release states that "[s]ubsidized solar farms have made it more difficult for farmers to access farmland by making it more expensive and less available," and that "since 2012, solar panels on farmland nationwide have increased by nearly 50%. That is why the Department is taking action." *See id.*

123. The press release provided no data to back up its statements regarding the effect of subsidized solar farms on access to farmland or the price of farmland, or its claim that solar panels on farmland nationwide have increased by nearly 50% since 2012.[42] *See id.*

[41] *See Farmer's Guide*, *supra* note 15.

[42] USDA's statement would be misleading even if it were true. A 50% increase in solar projects since 2012 would be trivial, given that the aggregate number of solar projects on farmland in that year was de minimis. Indeed, in 2012 USDA reported that only 57,299 farms out of 2.1 million "produced on-farm renewable energy" of *any* kind. *See 2012 Census of Agriculture Reveals New Trends in Farming: USDA Reports Record Sales Moderated by Rising Expenses; Agriculture is Increasingly Diverse; Farming and Marketing Practices are Changing*, USDA (May 2, 2014), https://www.nass.usda.gov/Newsroom/archive/2014/05_02_2014.php. Building renewable energy systems on more farms was precisely what Congress sought to achieve by enacting REAP.

124. In fact, when asked by reporters to substantiate the assertions in the press release, the RBCS Administrator stated in an internal email, "let's let the comms shop find . . . the rationale behind their statistics," while a USDA public affairs specialist wrote that she hoped the program staff could "drum up something."[43]

125. Ultimately, USDA staff responded to reporters' inquiries by stating that "USDA data on solar projects located mostly on agricultural land can be found" at a URL: https://www.ers.usda.gov/data-products/charts-of-note/109562.[44]

126. This URL links to a page titled "Charts of Note" which features a chart titled "Number of solar projects by land cover category and region, 2012-20."[45] The chart fails to substantiate the press release's assertion that since 2012 solar panels on farmland nationwide have increased by nearly 50%, and says nothing at all about the relationship between REAP-funded solar panels and access to farmland or farm prices.[46]

127. USDA staff also admitted in their emails to reporters that the Department "has not . . . estimated acres or producers affected" by the Anti-Solar Policy.[47]

[43] *See* Ex. C, FOIA Emails at 000056 to 000058.
[44] *See id.* at 000125, 000128.
[45] *See* Karen Maguire, Sophia Tanner & Justin B. Winikoff, *Solar Projects Were Located Mostly on Agricultural Land Between 2012 and 2020*, USDA (July 22, 2024), https://www.ers.usda.gov/data-products/charts-of-note/109562.
[46] *See id.*
[47] *See* Ex. C, FOIA Emails at 000125, 000128.

*e. Pursuant to the Anti-Solar EO, USDA Announces that It Will No Longer Make New REAP Grant Awards, and that It Refuses to Process Any Pending REAP Grant Applications*

128. Seven months later, on March 31, 2026, USDA issued a "Stakeholder Announcement," which announced additional actions USDA is undertaking pursuant to the Anti-Solar Policy. *See* Ex. E, Stakeholder Announcement.[48]

129. Specifically, the Stakeholder Announcement states that USDA remains committed to "ending . . . taxpayer handouts" for renewable energy, and states that USDA will update its REAP grant regulations to more fully implement the Anti-Solar EO at some indefinite point in the future. *See id*.

130. The Stakeholder Announcement also states that, in the meantime, USDA "will not be making further [REAP] grant awards." *See id*.

131. The Stakeholder Announcement applies retroactively to any "previously submitted" REAP grant application if the applicant does not possess a fully executed Financial Assistance Agreement.

132. The Stakeholder Announcement further states that any previously submitted REAP grant application will need to be resubmitted after USDA promulgates new grantmaking rules. *See id.*[49]

---

[48] Ex. E, USDA, *Stakeholder Announcement: Rural Business Cooperative Service Update on the Status of the Rural Energy for American Program* (Mar. 31, 2026), https://www.rd.usda.gov/media/file/download/usda-rd-reap-sa-03312026.pdf ("Stakeholder Announcement").

[49] *See also* Ex. F, USDA, *FY26 Rural Energy for America Program (REAP): Frequently Asked Questions* 1–2 (2026), https://www.rd.usda.gov/media/file/download/usda-rd-reap-faq-03312026.pdf ("Stakeholder Announcement FAQs") (confirming that the Stakeholder Announcement applies retroactively).

133. If resubmitted, USDA will process the application under the future grantmaking regulations, rather than those articulated in the 2024-27 NOFO or whichever NOFO governed when the original application was submitted.[50]

134. A month later, on April 15, 2026, USDA published a notice in the Federal Register formalizing the recission of the 2024-27 NOFO and reiterating that "[a]pplicants who previously submitted applications will be required to submit a new application and must comply with" the Department's forthcoming grantmaking regulations. *See* Notice of Rescission of Funding Opportunity for the Rural Energy for America Program, 91 Fed. Reg. 20090, 20090 (Apr. 15, 2026).

135. Applicants have no avenue to administratively appeal USDA's requirement to reapply. Applicants who attempted to do so received a determination from the National Appeals Division stating that the "matter is one of general applicability" and therefore "not subject to a NAD appeal."[51]

## III. The Anti-Solar Policy Has Significantly Harmed REAP Applicants, Solar Developers, Solar Installers, and REAP Consultants

136. The Anti-Solar Policy has achieved the Administration's primary goal: the rapid elimination of virtually all REAP funding for solar energy projects.

137. Upon information and belief, USDA has not awarded any REAP grants or loan guarantees for solar energy projects described in Secretary Rollins's press conference and USDA's Unnumbered Letter since August 2025.

---

[50] Ex. E, Stakeholder Announcement; Ex. F, Stakeholder Announcement FAQs (noting that no more grants will be awarded under the 2024-27 NOFO, and that an applicant who has already filed for a REAP grant "may file a new application in compliance with the forthcoming regulations").

[51] *See*, *e.g.*, Ex. G, NAD Appeal at 1.

138. USDA's broad and vague prohibition on the use of foreign components in solar energy installations, renders virtually all solar energy projects ineligible for loan guarantees.[52]

139. USDA's March 31, 2026 Stakeholder Announcement and Recission of the 2024-27 NOFO renders all solar energy projects ineligible for REAP grants.

140. USDA has not announced a date upon which the agency plans to promulgate its new grantmaking rules.

141. Even grant applicants whom USDA had already selected for funding—and encouraged to begin building their solar energy projects—were told they would need to reapply.

142. Under the forthcoming grantmaking rules further implementing the Anti-Solar Policy, reapplying will almost certainly be futile for many former applicants as USDA has signaled that it does not intend to award REAP grants for most solar energy projects.

143. Moreover, even if current applicants' projects could theoretically qualify under the future grant criteria, REAP applicants may only seek reimbursement for expenses incurred after an application is submitted. *See* 7 C.F.R. § 4280.115(c). Consequently, applicants will be unable to secure reimbursement for any expenses already incurred to construct their projects in reliance on USDA's prior rules and representations.

144. Grant and loan guarantee applicants, REAP consultants, solar developers, and solar installers—including several Plaintiffs or their members—invested significant time and resources into completing REAP applications and into building out solar energy projects that qualified for REAP under the then operative grantmaking rules:

- REAP applicants invested time into completing applications themselves, or alternatively invested money to procure the services of a REAP consultant.

[52] *See* Ex. D, Strong Stewardship FAQs at 000022, 000024.

- Applicants who were encouraged by USDA to begin construction on their projects after their grant applications were selected for funding incurred significant costs to implement their projects by, for example, entering into contracts with and paying solar developers and installers.
- REAP consultants working on a contingency fee basis invested staff time and resources into completing applications on the reasonable expectation that USDA would evaluate their clients' projects under then-existing criteria.
- Solar developers and installers entered contracts and built out solar energy projects on the reasonable expectation that USDA would disburse REAP grants to awardees pursuant to the existing rules and criteria.
- Solar developers, solar installers, and REAP consultants invested significant time and effort in building relationships with solar energy project applicants and partnering with them as part of the REAP application and implementation process on the reasonable expectation that USDA would meet its legal obligation to continue supporting the program.

145. These businesses and individuals had a reasonable expectation that Defendants would act lawfully and abide by Congress's statutory directives to continue implementing REAP.

146. Plaintiffs had a reasonable expectation that the applications and projects they invested in would remain eligible for loan guarantees, grants, and reimbursement under the NOFO in effect when their applications were submitted.

147. Plaintiffs had a reasonable expectation that USDA would not suddenly and retroactively change the rules governing their applications after they already applied and after USDA encouraged many of them to begin or complete project construction.

148. USDA's Anti-Solar Policy severely harms Plaintiffs who have already submitted REAP applications. Plaintiffs cannot recoup their significant investments of time and money.

149. In addition, USDA's unlawful actions have harmed the professional reputation of the REAP consultants, solar developers, and solar installers who staked their reputations on helping their clients secure REAP awards.

150. For example, USDA's unlawful actions deprived IFU member Ed Heishman of the opportunity to compete for a REAP grant award worth $128,032. Mr. Heishman, an Iowa farmer who raises hogs and grows beans and corn, applied for a REAP grant under the 2024-27 NOFO. After USDA notified him that the Department had received the application, Mr. Heishman invested $256,064 in a 139-kW rooftop solar energy project, which was eligible for 50% reimbursement under REAP, the Inflation Reduction Act, and the 2024-27 NOFO. However, on March 31, 2026, USDA notified Mr. Heishman that it would not process his application, effectively denying him more than $100,000 of expected reimbursement funds.

151. USDA's refusal to process REAP applications received under previous NOFOs has also significantly and directly harmed solar developers and installers and REAP consultants. For example, USDA's actions have already caused concrete economic injury to Wolf River. Approximately 19 proposed solar projects were halted entirely after REAP grant funding became unavailable. At least two additional Wolf River customers that had planned larger solar projects with anticipated REAP assistance abandoned the REAP process and proceeded with smaller projects rather than wait for USDA to resume processing REAP applications. Wolf River's records identify more than 300 customer engagements involving REAP and proposed solar energy projects, and USDA's actions continue to impair this customer pipeline by causing prospective customers to cancel, delay, or reduce their projects. The resulting loss of REAP-

related work and revenue also forced Wolf River to lay off its full-time Director of Policy and Grants.

152. Other examples of harm caused to the Plaintiffs by the Anti-Solar Policy abound. USDA's actions deprived RENEW member WES Engineering of the possibility of fulfilling a solar installation contract worth $101,000 in revenue as the contract was contingent on REAP grant funds being awarded. USDA's refusal to process REAP applications has similarly caused clients of RENEW member Northwind Solar, ISETA and RENEW member Eagle Point Solar, and SUN member Green Hill Solar to cancel, pare back, or indefinitely delay solar installation contracts. USDA's actions also significantly harmed IFU and ISETA member Veronica McFadden, the founder of Sun Grants Consulting. Sun Grants helps farmers and rural small businesses navigate the REAP process and obtain REAP benefits. Sun Grants' clients only pay for Sun Grants' services when USDA approves their REAP applications and obligates the grant funds. USDA's March 31st stakeholder letter impacted fifty-five of Sun Grants' REAP applications. Because USDA will not process those applications, there is no longer a possibility that Sun Grants will be paid for preparing those applications. USDA's Anti-Solar Policy has effectively frozen the REAP grant-writing market, which caused Sun Grants to lay off its entire staff.

153. Plaintiffs also face prospective harm. For example, Wolf River has designed eight proposed solar energy and battery-storage projects for Tribal partners that appear to satisfy REAP's eligibility criteria under the rules in effect before the Anti-Solar Policy. Those projects would reduce energy costs and provide backup power for essential Tribal community businesses and services. Wolf River has devoted substantial employee time and resources to evaluating, designing, and developing these and other proposed REAP projects. Wolf River and its Tribal

partners intend to pursue REAP assistance and proceed with the projects if USDA resumes accepting and processing solar energy applications under lawful criteria. Vacating the Anti-Solar Policy would permit Wolf River's affected customers and Tribal partners to pursue REAP assistance and would restore Wolf River's opportunity to perform the associated development and installation work.

154. Much like Wolf River, other Plaintiffs in this case would like to be able to apply REAP awards and build new solar projects that are now ineligible for REAP. The Anti-Solar Policy significantly reduces the market for REAP consulting, harming Plaintiff REAP consultants. USDA's application of its anti-solar eligibility criteria for REAP loan guarantees has reduced the addressable market for solar energy project development for solar developer and installer Plaintiffs and Plaintiff members.

## FIRST CAUSE OF ACTION

**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Agency Action Not in Accordance with Law (Rural Energy for America Program, 7 U.S.C. § 8107(c))**

155. Plaintiffs reallege and incorporate by reference the allegations made in all preceding paragraphs.

156. Defendants are "agencies" under the APA, 5 U.S.C. § 551(1).

157. The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A).

158. Defendants' Anti-Solar Policy, which ends eligibility for REAP assistance for the vast majority of rural and agricultural solar projects, is a final agency action. The policy marks the culmination of USDA's decision-making, as evidenced by the fact that it has direct consequences significantly affecting the Plaintiffs:

- It significantly reduces the size of the rural and agricultural solar project development and panel installation market;
- It has rendered Applicant-Plaintiffs who were previously eligible for REAP grants and loan guarantees ineligible for REAP funding;
- It has rendered Applicant-Plaintiffs ineligible to apply for REAP grants in the future;
- It eliminates Applicant-Plaintiffs' opportunity to recover funds they expended on REAP solar energy applications and projects in reasonable reliance on USDA's representations and assurances;
- It eliminates the opportunity for REAP Consultant Plaintiffs to be compensated for pending applications submitted pursuant to prior NOFOs;
- It freezes the market for REAP grant writing;
- It significantly reduces the revenues of REAP consultant, solar developer, and solar installer Plaintiffs; and
- It significantly harms the reputation of REAP consultant, solar developer, and solar energy installer Plaintiffs.

159. Defendants' Anti-Solar Policy runs counter to the statutory purpose of REAP, which is to promote environmentally beneficial renewable energy production in agricultural and rural communities, including through solar project development. 7 U.S.C. § 8101(15), (16); *id.* § 8107(a).

160. Indeed, Defendants expressly state that the Anti-Solar Policy aims to end taxpayer support for solar energy systems for aesthetic purposes, to perpetuate the use of fossil fuels, and

for other reasons unrelated to or in conflict with REAP's purposes. *See* Anti-Solar EO; Ex. B, Press Release; Ex. A, Unnumbered Letter.

161. Defendants' Anti-Solar Policy also undermines the REAP statute's express directives to: "provide . . . loan guarantees and grants to agricultural producers and rural small businesses . . . to purchase renewable energy systems," including solar systems, 7 U.S.C. § 8107(c)(1)(A)(i)(I), and "ensure, to the maximum extent practicable, that adequate outreach relating" to REAP is conducted "at the State and local levels." *id.* § 8107(d).

162. The Anti-Solar Policy contravenes these congressional directives, as is evident from USDA's own announcement that one of the principal goals of the Anti-Solar Policy is to "end taxpayer support for," rather than promote, renewable energy technologies.

163. By having the effect of eliminating virtually all REAP funding for solar energy projects, the Anti-Solar Policy contravenes these congressional directives.

164. Federal agencies "may not ignore statutory mandates or prohibitions merely because of policy disagreements with Congress." *In re Aiken County*, 725 F.3d 255, 260 (D.C. Cir. 2013).

165. Accordingly, for these reasons, Defendants' Anti-Solar Policy is not in accordance with law because it contravenes Congress's purposes and the explicit requirements stated in the REAP statute.

## <u>SECOND CAUSE OF ACTION</u>

**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(C)**
**Agency Action in Excess of Statutory Authority or Short of Statutory Right (Rural Energy for America Program, 7 U.S.C. § 8107)**

166. Plaintiffs reallege and incorporate by reference the allegations made in all preceding paragraphs.

167. As a part of their Anti-Solar Policy, Defendants have created a series of new, non-statutory eligibility criteria for loan guarantees ("Anti-Solar Eligibility Criteria"). *See* Ex. A, Unnumbered Letter at 2–3.

168. The REAP statute does not authorize Defendants to adopt the non-statutory Anti-Solar Eligibility Criteria.

169. The REAP statute requires USDA to "promote energy efficiency and renewable energy development for agricultural producers and rural small businesses through" grants and loan guarantees. 7 U.S.C. § 8107(a). The REAP statute defines "renewable energy" to include solar energy. *See id.* at § 8101(15)(A).

170. As stated above, the REAP statute includes only two minimal express eligibility criteria for grant and loan guarantee awards for renewable energy projects. *Id.* § 8107(c)(1)(A)–(B) (articulating REAP eligibility restrictions).

171. The Defendants' Anti-Solar Eligibility Criteria plainly do not implement Congress's permissive statutory eligibility criteria, but instead effectively prohibit loan guarantees for solar energy projects.

172. Defendants' restrictive non-statutory eligibility criteria contravene the REAP statute's stated primary goal to promote the development of environmentally beneficial renewable energy for agricultural producers and rural small businesses. *See id.* § 8107(a), (c)(2); 148 Cong. Rec. S1108 (daily ed. Feb. 25, 2002).

173. As noted above, the REAP statute also requires USDA to consider six evaluation factors when deciding the amount of a loan guarantee or grant to disburse to an eligible project. *See* 7 U.S.C. § 8107(c)(2)(A)–(F) (articulating REAP evaluation factors). The six statutory factors relate directly to REAP's core purposes: saving or generating energy by deploying energy

efficiency improvements or renewable energy systems for the benefit of the environment. *Id.* In addition to these six statutory factors, Congress authorized USDA to consider "other appropriate factors" when evaluating REAP applications. *Id.* § 8107(c)(2)(G).

174. Defendants' Anti-Solar Eligibility Criteria are not "other appropriate" evaluation factors because they expressly aim to frustrate the core purposes of REAP. At the same time, the Defendants' stated objectives regarding land use, aesthetics, and component origin are entirely outside of the scope of REAP. Even if USDA's Anti-Solar Eligibility Criteria were based on "appropriate factors," such factors may not completely displace REAP's mandatory, express statutory evaluation factors.

175. Accordingly, Defendants' adoption and application of the Anti-Solar Eligibility Criteria render the action in excess of statutory authority.

## THIRD CAUSE OF ACTION

### Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### Agency Action that is Arbitrary and Capricious and an Abuse of Discretion

176. Plaintiffs reallege and incorporate by reference the allegations made in all preceding paragraphs.

177. The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

178. Defendants' Anti-Solar Policy is arbitrary and capricious for at least seven independent reasons.

179. First, Defendants relied on factors Congress did not intend USDA to consider such as aesthetics and a desire to promote fossil fuels, in awarding REAP loan guarantees and

grants. *Contra* 7 U.S.C. § 8107(c)(2) (articulating the factors that USDA "shall take into consideration" when determining loan guarantee and grant awards).

180. Second, USDA failed to consider the ways in which its Anti-Solar Policy would undermine rather than advance the primary goals of the REAP statute by *reducing* support for renewable energy on agricultural land and elsewhere in rural America as a part of a broader effort to promote fossil fuels.

181. Third, the Anti-Solar Policy does not meaningfully advance the goals that Defendants claim to be pursuing. For example, although Defendants try to justify the Anti-Solar Policy as a break for taxpayers, the REAP loan guarantee program historically has cost the taxpayer nothing while generating government revenue.[53] Likewise, Defendants' blanket ban on agrivoltaics on certified cropland does not further USDA's purported goal of protecting farmland from conversion because agrivoltaics are designed to protect farmland.

182. Fourth, Defendants have failed to consider alternatives to the Anti-Solar Policy that could achieve their goals.

183. Fifth, Defendants' various assertions about the drawbacks of solar energy are not substantiated—and in many ways are contradicted—by evidence, reflecting Defendants' unlawful choice to act first and "find . . . the rationale" later. [54]

184. Sixth, Defendants have failed to consider the ways in which the Anti-Solar Policy has upended serious reliance interests of REAP applicants who invested time, money, and other

---

[53] *See* USDA, *2025 USDA Explanatory Notes - Rural Business Cooperative Service*, at 32-47 (2024), https://www.usda.gov/sites/default/files/documents/32-RBCS-2025-ExNotes.pdf (noting that the REAP "loan program has a negative subsidy rate"); S. Rep. No. 119-37, at 101 (2025) (noting that the "Rural Energy for America Program . . . has a negative subsidy rate");
[54] *See* Ex. C, FOIA Emails at 000056 to 000058.

resources into solar projects and REAP grant and loan guarantee applications with the reasonable expectation that their applications would be evaluated under the then-existing rules.

185. Seventh, Defendants have failed to acknowledge that they are shifting from their previous position that REAP-funded solar projects provide a plethora of benefits to farmers and rural communities. Indeed, Defendants extolled the significant benefits of REAP-funded solar projects just months before USDA announced its Anti-Solar Policy only to suddenly recharacterize such solar projects as “wasteful,” “unreliable,” or harmful to young farmers. The agency has not provided an explanation for why it is changing policy.

186. For each of the above reasons, the Anti-Solar Policy is arbitrary and capricious, and an abuse of discretion, in violation of the APA.

## FOURTH CAUSE OF ACTION

### Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### Agency Action Not in Accordance with Law (Unlawful Retroactive Application of Agency Rules)

187. Plaintiffs reallege and incorporate by reference the allegations made in all preceding paragraphs.

188. An agency may not create a retroactive rule that attaches new legal consequences to events completed before the rule’s enactment, unless expressly authorized to do so by statute.

189. Agencies may not create rules that upset expectations based in prior law, unless the rules advance a statutory interest and have a benefit that outweighs the harms associated with the rule.

190. USDA has unlawfully applied the Anti-Solar Policy retroactively even though neither the REAP statute nor any other statute provides USDA with express authorization to promulgate retroactive rules for REAP. *See* 7 U.S.C. § 8107 (absence).

191. By applying the Anti-Solar Policy retroactively, USDA has unlawfully upset reasonable expectations based on prior law because the policy does not advance a statutory interest underlying REAP.

192. In the alternative, even if retroactive application of the policy were consistent with the purposes of REAP, any benefits of retroactive application fail to outweigh the significant disruption of reliance interests of REAP applicants, REAP consultants, solar developers, and solar panel installers.

193. Consequently, the retroactive application of the Anti-Solar Policy is not in accordance with law and violates the APA.

## FIFTH CAUSE OF ACTION

### Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (D) Agency Action Not in Accordance with Procedure or Law (Projects Eligible and Ineligible for REAP Loan Guarantees, 7 C.F.R. §§ 5001.106, 5001.115, 5001.119)

194. Plaintiffs reallege and incorporate by reference the allegations made in all preceding paragraphs.

195. Agencies are bound by their own regulations.

196. Defendants have promulgated detailed regulations explaining what types of renewable energy systems are eligible for loan guarantees, *see* 7 C.F.R. § 5001.106, as well as regulations compiling an exhaustive list of projects ineligible for REAP loan guarantees. *Id.* §§ 5001.115, 5001.119.

197. Most solar energy projects that are eligible for REAP loan guarantees under USDA's current regulations are now ineligible for loan guarantees under Defendants' Anti-Solar Policy. *Compare* 7 C.F.R. §§ 5001.106, 5001.115, 5001.119; *with* Ex. A, Unnumbered Letter; Ex. B, Press Release.

198. For example, Defendants' Anti-Solar Policy disqualifies solar projects from receiving a REAP loan guarantee if certain components are made in certain foreign countries. *See* Ex. D, Strong Stewardship FAQs at 000022. This requirement is not present in any of Defendants' regulations. 7 C.F.R. §§ 5001.106, 5001.115, 5001.119 (absence).

199. Thus, the Anti-Solar Policy directly conflicts with Defendants' regulatory eligibility criteria for REAP Loan Guarantees.

## SIXTH CAUSE OF ACTION

### Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (D) Agency Action Not in Accordance with Procedure or Law (Amending Grantmaking Criteria, 7 C.F.R. § 4280.121, 2024-27 NOFO)

200. Plaintiffs reallege and incorporate by reference the allegations made in all preceding paragraphs.

201. Agencies are bound by their own regulations.

202. USDA's regulations and the 2024-27 NOFO prohibit the Department from retroactively applying new eligibility and evaluation criteria to REAP applications already received by USDA. 7 C.F.R. § 4280.121; 2024-27 NOFO, 89 Fed. Reg. at 83449.

203. USDA's regulations governing REAP state that "Agency personnel will score each complete and eligible [REAP] application based on the scoring criteria specified in this section, unless otherwise specified in a Federal Register notice." 7 C.F.R. § 4280.121.

204. Similarly, the 2024-27 NOFO stated that "[a]pplications received the date following the publication of this notice through September 30, 2027, will be evaluated and scored according to the provisions listed in this notice, unless otherwise amended via a subsequent notice." 2024-27 NOFO, 89 Fed. Reg. at 83449.

205. Defendants' regulations allow them to prospectively "amend" grant evaluation criteria once they have "otherwise specified" new criteria. 7 C.F.R. § 4180.121.

206. Nothing in that provision, however, authorizes USDA to rescind existing criteria, freeze the program, and hold all pending applications indefinitely so it can later retroactively apply some future, as-yet-unspecified criteria.

207. In rescinding the operative NOFO, Defendants did not adopt a new set of procedures to govern its evaluation and processing of REAP applications moving forward. Defendants have not published a Federal Register Notice with the new Anti-Solar Eligibility Criteria or any other changes to REAP's operative evaluation criteria from October 16, 2024.

208. Thus, by rescinding the 2024-27 NOFO criteria, but failing to "specify" any new criteria or "amend" the 2024-27 NOFO criteria, Defendants have violated their own regulations and procedures.

209. Therefore, the Defendants' actions violate the APA because they are not in accordance with procedure or law.

**REQUESTS FOR RELIEF**

Wherefore, Plaintiffs respectfully request that this Court:

1. Issue a declaration that Defendants' Anti-Solar Policy as described herein and each of USDA's constitutive actions are unlawful – including:

- the promulgation of anti-solar REAP criteria articulated in the August 19, 2025 press release,
- the promulgation of anti-solar REAP criteria articulated in the August 19, 2025 Unnumbered Letter,

- the retroactive recission of the 2024-27 NOFO and refusal to process applications submitted under prior NOFOs as articulated in the March 31, 2026 Stakeholder Announcement, and
- the retroactive recission of the 2024-27 NOFO and refusal to process applications submitted under prior NOFOs as articulated the April 15, 2026 Notice of Rescission of Funding Opportunity for the Rural Energy for America Program;

2. Vacate and set aside the Anti-Solar Policy as described herein and each of USDA's constitutive actions – including:

- the promulgation of anti-solar REAP criteria articulated in the August 19, 2025 press release,
- the promulgation of anti-solar REAP criteria articulated in the August 19, 2025 Unnumbered Letter,
- the retroactive recission of the 2024-27 NOFO and refusal to process applications submitted under prior NOFOs as articulated in the March 31, 2026 Stakeholder Announcement, and
- the retroactive recission of the 2024-27 NOFO and refusal to process applications submitted under prior NOFOs as articulated the April 15, 2026 Notice of Rescission of Funding Opportunity for the Rural Energy for America Program;

3. Order Defendants to return to processing REAP loan guarantee and grant applications received prior to April 15, 2026, in accordance with the applicable prior USDA NOFO for REAP;

4. Preliminarily and permanently enjoin Defendants from giving effect to or maintaining the Anti-Solar Policy and constitutive actions described herein;

5. Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

6. Grant any and all other such relief as the Court may deem appropriate.

Dated this 28th day of September 2026.

Respectfully submitted,

/s/ Carrie Apfel
Carrie Apfel
DC Bar No. 974342
Earthjustice
250 I Street NW, 4th Floor
Washington, DC 20005
(202) 667-4500
capfel@earthjustice.org

Michael Youhana*
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
(212) 284-8033
myouhana@earthjustice.org

*Counsel for David Book and James Book, in their representative capacities as co-trustee of the Donald M. Book GST Exempt Residuary Trust; SVF, LLC; New York Solar Energy Industries Association; LTL LED, LLC d/b/a Wolf River Electric; Clean Power Consultants; and David A. Loney Consulting*

**Pro Hac Vice application forthcoming*

/s/ Brian Lynk
Brian Lynk
DC Bar No. 459525
Jessica O'Donnell**
DC Bar No. 473166
Chad Hughes**
DC Bar No. 90024009
Environmental Law & Policy Center
740 15th Street NW, Suite 700
Washington, DC 20005
(312) 673-6500
blynk@elpc.org
jodonnell@elpc.org
chughes@elpc.org

*Counsel for Iowa Farmers Union, Iowa Solar Energy Trade Association, RENEW Wisconsin, and Solar United Neighbors*

Nicholas J. Kasprowicz*
General Counsel
LTL LED, LLC d/b/a Wolf River Electric
100 Isanti Parkway Northeast
Isanti, Minnesota 55040
(612) 305-8410
nick@wolfriverelectric.com

*Counsel for LTL LED, LLC d/b/a Wolf River Electric*

***Application for admission pending*